## GRIGGS *v.* DAY *et al.*

*(Superior Court of New York City, General Term.* December 1, 1890.)

PLEDGE—RIGHTS OF PLEDGEOR—EXTINGUISHMENT OF DEBT.

Plaintiff contracted with a railroad company to construct part of its road, the company to make certain advances to him in money and in its first-mortgage bonds and stock. The company not furnishing money as agreed, G. advanced large sums to plaintiff, and the company issued its notes for the amounts so advanced, to plaintiff, which he transferred to G. as security for his advances. G. subsequently presented to the company a claim against it, including these notes, whereupon, with plaintiff's knowledge and approval, the directors of the company authorized its president "to sell and deliver" to G. second-mortgage bonds of the company at the rate of 75 cents on the dollar, "the same to be delivered in part payment of his claims against this company;" and such bonds were so delivered to G., and a part of the notes held by G. were surrendered to the company. G. had previously purchased from plaintiff, at 85 cents on the dollar, the first-mortgage bonds issued to plaintiff by the company. Plaintiff was not pecuniarily responsible; and, in G.'s books, in which plaintiff was charged with the advances made to him by G., the notes were credited to him at 75 per cent. of their amount, as "taken from contractor at 75%," and the difference was credited to the interest account as discount on the notes; the company was charged with the whole amount of the notes, and credited with 75 per cent. of the par value of the bonds, and a subsequent entry, crediting to plaintiff the discount on the notes, was canceled as "null and void," having been made without proper directions from G." *Held,* that the taking of the second-mortgage bonds by G. was not merely a substitution of them for the notes as security for plaintiff's indebtedness to G., but a purchase of them by G. for his own benefit, which extinguished the indebtedness of plaintiff to the extent of the amount for which the notes were transferred in payment for the bonds; and, on an accounting between the parties, plaintiff was entitled to a credit of that amount. INGRAHAM, J., dissenting.

Appeal from judgment on report of referee.

Action by Clark R. Griggs against Melville C. Day and another, as executors of Cornelius K. Garrison, deceased, for an accounting of transactions between plaintiff and said Garrison.

Argued before SEDGWICK, C. J., and FREEDMAN and INGRAHAM, JJ.

*Robert G. Ingersoll,* for appellant. *Melville C. Day,* for respondent.

SEDGWICK, C. J. The action was for an accounting in respect of mutual dealings between the parties that concerned the construction of a railway for the Wheeling & Lake Erie Railroad Company. The answer averred that there had been a final settlement in respect of the dealing, and that if there were a new accounting the plaintiff would be found to be largely indebted to the defendant. The referee held that there should be an accounting, and proceeded to take it. The referee found that about September 24, 1879, a contract was made between the plaintiff and the Wheeling & Lake Erie Railroad Company. It is not at present necessary to give all the provisions of the contract. For the purposes of the contract it declared that the railroad to be built should be deemed to consist of three divisions. The plaintiff agreed to do everything necessary to the beginning and completion and operation of a railroad over the first and second divisions and over so much of the third division as thereafter should be found to be expedient. The company agreed to pay to the plaintiff, from time to time, certain amounts of fully paid for shares of stock and of bonds of the company. The company further agreed to fur-

nish to the plaintiff $4,000 a mile of the first and second divisions, to be applied to obtaining the right of way, to bridging and tieing, and to use its best endeavors to furnish like money for the third division. The plaintiff was not required to begin or continue the work until he had received from the company notice that it was ready to furnish the money as it had agreed. It was further agreed that the company should issue to trustees, for the use the contractor, (the plaintiff,) $3,500,000 of its first-mortgage bonds and $3,500,-000 of its fully paid for shares of its capital stock, and that upon the completion of each section of five miles the trustees should deliver the bonds and stock to the plaintiff at the rate of $15,000 of each mile of track. It was further agreed that upon the written consent of the president of the company, the contractor, (the plaintiff,) should be allowed to draw bonds from said trustee for the purpose of buying iron, material, and rolling stock for any division of the railroad, or of hypothecating the said bonds for that purpose to an amount equal to those he would be entitled to upon the completion of a division, with the understanding and agreement that the title of the property so procured shall vest at once in the company, and not in the contractor. After the execution of the contract the company executed and delivered to the Farmers' Loan & Trust Company 3,500,000 of shares of stock and 3,500 of its bonds for the payment of $1,000 each, and a mortgage to secure the payment of the bonds. About July 10, 1880, the company gave to the plaintiff the notice that it had means to pay him, under the contract, for the grading, bridging, and tieing of the road. Before December 17, 1880, the trustees had delivered, as provided in the contract, 3,307 of the bonds of the company. In November, 1880, the original defendant, C. K. Garrison, who since his death is represented by his executors, the defendants in this action, lent $15,000 to the plaintiff upon his note and 100 of said bonds as security for its payment. In December C. K. Garrison lent to the plaintiff $45,000, and as security for the repayment of it plaintiff transferred to Garrison the 3,307 bonds above referred to. The writing which the plaintiff gave upon receiving the loan declared: "I further authorize the sale of all or any part of said bonds at 85 per cent. net, and for every $15,000 of bonds sold by said Garrison or myself, or any other person, I agree to transfer to said Garrison, and authorize him to retain from any stock to be received under said construction contract, $7,000 of full-paid stock over the amount of loan and interest to be paid." For a long time after this transaction Garrison furnished to the plaintiff large sums of money as means to the plaintiff of performing his obligation under the contract to construct and equip the railroad. The company did not furnish, as it had agreed to furnish, money to the amount of $4,000 per mile wherewith to acquire a right of way and to grade, bridge, or tie any part of any of the divisions of the railway, and Garrison promised to plaintiff to advance, and did advance, for such purposes, and from time to time, large sums of money. On the 20th December, 1881, the board of trustees of the company adopted certain resolutions. They recited that the company had failed to comply with the agreement to furnish the plaintiff with means to acquire the right of way, and to bridge, grade, and tie, and it authorized the plaintiff to make the necessary advances for such purposes in the future as he had in the past, and they authorized the president of the company, upon the report of a committee then appointed, to issue to the plaintiff or the assignee of his contract for such amounts as he may have advanced for the right of way, etc., "non-negotiable certificates of this company, bearing interest at the rate of 6 per cent., payable 60 days after issuance. About January 1, 1882, the company issued under this resolution 13 notes to the plaintiff. They amounted in gross to the sum of $1,234,177.33. About the time they were issued to the plaintiff he transferred them to Garrison as security for advances made by him to and for the plaintiff. About February 20, 1883, the company issued to the plaintiff, under the resolution, eight other notes

for the aggregate amount of $715,533.39. The plaintiff transferred to Garrison these notes, also, as security. These 21 notes were for the amount in all of $1,949,710.72. The whole of that sum, excepting $175,000, had been advanced by Garrison to the plaintiff. The latter sum represented a compensation of 10 per cent., which the contract had provided should be paid to the plaintiff. The referee finds that it was "understood and agreed by the parties that these promissory notes * * * should be issued as a temporary expedient for the purpose of stating the accounts, and that thereafter, as soon as practicable, second-mortgage bonds should be issued to secure or provide for said indebtedness, and to take the place of said notes so temporarily issued."

I do not think that the testimony shows that before April 19, 1883, the parties had a definite understanding that second-mortgage bonds should take the place of the notes. The whole of the understanding was that in some way, then not particularized, the second-mortgage bonds should be used, e. g., to retire the notes either by raising money upon the bonds and paying the notes with that money, or exchanging the bonds for the notes. The latter alternative would substitute the bonds as collateral security for the notes. In the month of May, 1881, Garrison had purchased of the plaintiff 1,907 of the first-mortgage bonds, and gave the plaintiff credit in the account for the purchase price thereof to net the sum of $1,620,950, and for the accrued interest. This is found in the thirteenth finding. In the twenty-fifth finding it was found that about April 1, 1882, "the said Garrison gave the plaintiff credit in his account for 550 of the said first-mortgage bonds at the rate of 85 per cent. of their par value, amounting to the sum of $467,500," and also for the accrued interest. On April 19, 1883, there was a meeting of the board of trustees of the company. The following letter was presented to the board:

"NEW YORK, April 18, 1883.

"*To the President and Directors of the Wheeling & Lake Erie R. R. Co.* —GENTLEMEN: As the contractor intends to turn over the road to the company on the 1st of May, 1883, I have to ask you to settle with me for the cash advances which I have made for your company, viz.:

| | | |
|---|---:|---:|
| For fire insurance on depot building, rolling stock, etc., for one year, - - - - - - - | | $  3,991 12 |
| Coupons uncanceled (1st Mtg. bonds) due May 1, 1881, - - - | $   2,490 00 | |
| Interest, - - - - | 297 80 | |
| Due Nov. 1, 1881, - - - | 60,000 00 | |
| Interest, - - - - | 5,400 00 | |
| Due May 1, 1882, - - - - | 76,500 00 | |
| Interest, - - - - | 4,590 00 | |
| Due Nov. 1, 1882, - - - | 76,500 00 | |
| Interest, - - - - | 2,295 00 | |
| Due May 1, 1883, - - - - | 76,500 00 | |
| For notes of the company, - - | 1,949,710 72 | |
| Interest, - - - - - | 112,932 41 | |
| For notes of Co. to receive about, - | 78,705 63 | |
| | | 2,445,921 56 |
| Total amount due May 1, 1883, - - - | | $2,449,912 68 |

"For which I respectfully ask a settlement.
[Signed]                                    "C. K. GARRISON."

The referee finds (thirty-eighth finding) that "both the plaintiff and said Garrison were present at said directors' meeting, and said Garrison proposed verbally to accept second-mortgage bonds of the said railroad company at the rate of 75 cents on the dollar, in partial liquidation of the claim presented

NEW YORK SUPPLEMENT, vol. 11. [Super. Ct. N.Y.

by him and set forth in the said communication, and thereupon the following action was taken by the said directors, as appears by the minutes of said meeting," as follows: "Moved by Mr. Wickham that the president of this company be authorized to sell and deliver to C. K. Garrison second-mortgage bonds to the amount of $2,280,000 at the rate of seventy-five cents on the dollar, and interest accrued from March 1, 1883, the same to be delivered in part payment of his claim against this company, amounting to $2,449,912.68, as this day specified in his communication to this company, seconded by Mr. Warwick, and carried without dissent." The thirty-ninth finding is: "Soon thereafter the said Garrison received from the said railroad company 2,280 of the said second-mortgage bonds of the par value of $1,000 each, at the rate and price of 75 cents on the dollar, which price (including $26,000 for interest on said bonds from March 1, 1883, to May 1, 1883) amounted to $1,736,-000, in exchange and payment for which the said Garrison delivered to said railroad company a portion of" the said promissory notes. The forty-first finding is: "The remainder of the said promissory notes, that is to say, those not exchanged for second-mortgage bonds, amounting to the sum of $326,-043.12, were on or about the 1st day of May, 1883, surrendered or delivered to said railroad company by said C. K. Garrison without consideration, and were canceled by said company. The value of said notes when so surrendered was the sum of $239,046.55." The fortieth finding is: "The said exchange of said promissory notes for the said second-mortgage bonds of said railroad company was made with the knowledge, consent, and approval of the plaintiff, and the said Garrison received and held the said bonds as collateral security in the place and stead of said promissory notes. The said 2,280 second-mortgage bonds are still held by the defendants Day, Forest, and D. E. Garrison, the executors of the said Cornelius K. Garrison, now deceased." The referee held on this subject that the taking of the second-mortgage bonds did not satisfy or extinguish the original indebtedness for which the notes were given as collateral security; and it did not if it is assumed that the second-mortgage bonds were merely exchanged for or substituted for the notes. In the latter case, however, the defendants would be liable for the conversion of the second-mortgage bonds, for there can hardly be a doubt that his claim, persisted in in the pleadings and on the trial, that they were not held as security, but were his own by assignment from plaintiff, coupled with his dealing with them as his own property, as appears by his books in the statement of his assets, and then assigning them to Mr. Ferry, for the benefit of his creditors, made a conversion. But the argument of the appellant did not claim anything on this score. The appellant, however, claims that the transaction did result in the extinguishment of the original indebtedness wholly, and if not wholly, at least partly, and to an extent which requires the reversal of the judgment. If the "exchange" said in the fortieth finding to have been made with the knowledge, consent, and approval of the plaintiff, refers to the actual transaction described in the thirty-ninth finding, as distinguished from the agreement in the thirty-eighth finding, then from the form and intrinsic character of the transaction, as disclosed by the testimony, to which attention will be given, Garrison took the notes as his own as if by sale from plaintiff, and used them to satisfy his personal obligation to take from the company 2,280 bonds of the company at 75 cents on the dollar. The knowledge, consent, and approval of the plaintiff to such a transaction would not deprive him of the benefit of the actual transaction, which would be the extinguishment of the original indebtedness, at least to the extent of the consideration which Garrison named in his books, as that for which he bought the notes from the plaintiff. If the "exchange" which the plaintiff approved was such as was described by the terms of the resolution in the thirty-eighth finding, that must be construed as a contract would be, according to unambiguous terms or its terms if ambiguous, as determined by extrinsic circumstances. Refer-

ring, now, to but one of these circumstances, namely, that afterwards in the transaction Garrison took these bonds for himself, and not for the plaintiff, it seems that the agreement was that the bonds were sold to Garrison individually, and not acting for the plaintiff, as he would act in the mere substitution of the bonds for the notes. If the bonds were to be delivered in part payment of the claim contained in the letter this would imply as between all the parties, for by the finding the plaintiff approved that the claim was to be deemed extinguished for Garrison's benefit. This inures to plaintiff's benefit. Such an extinguishment would discharge his original indebtedness.

Under the circumstances disclosed there was nothing at variance with Mr. Garrison's former conduct. He had before taken first-mortgage bonds at 85 cents on the dollar, crediting the plaintiff with that amount. He repeated the operation in kind excepting that he paid less. The evidence shows that he or his agents thought the bonds a better form of security than the notes. The plaintiff, as defendants' pleadings insist, was without pecuniary responsibility, and there was a certain advantage in not leaving the plaintiff the owner even of a second incumbrance upon the property, as he would have been left, if Garrison should hold the bonds simply as a security. The fortieth finding, after finding that the "said exchange" was made with the approval of plaintiff, finds that the said Garrison received and held the said bonds as collateral security in the place and stead of said promissory notes." It is not found that this receiving and holding by Garrison was with the plaintiff's approval, but there is no doubt that such a finding should be considered as intended. The testimony does not show that plaintiff ever assented to an arrangement by which, as between himself and Garrison, after Garrison had bought the bonds for his own benefit, Garrison should hold the Londs as collateral security, or, in other words, that the purchase of the bonds should be formally in Garrison's name. At the most, plaintiff's agreement, before the resolution was passed, and his presence when it was passed and his approval then, bound him to nothing more than to the terms of the resolution, and to its execution afterwards. By those terms and that execution Garrison extinguished the collateral notes for his own benefit, and that extinguished the debt for the payment of which the collaterals were held. The difference in this case between exchanging the bonds for the notes or the notes for the bonds and the buying of the bonds by Garrison and paying for the bonds by delivering notes belonging to the plaintiff, is distinct and substantial. The two cases have in common nothing more than that physically the two sets of papers are exchanged. The manner in which the arrangement proposed by the resolution was carried out, according to evidence which the defendant cannot controvert, shows that so far as Garrison was concerned, and so far as he could bind the plaintiff by his acts, he bought the notes of the plaintiff, and then used them to buy the bonds for his own and individual benefit. It is argued against this position that for a purchase of the notes in reality it was necessary that the plaintiff should have been a cognizant and assenting seller. This will be further alluded to when the facts are stated, and yet on this point it may be noticed that the justification of Garrison's conduct in respect of the notes is placed by the learned counsel for the respondent upon the following positions. He argues that a transfer of interests proven in the case, which in fact included these notes, and which the referee on the trial held was made as collateral security, although unconditional on its face, "did have a purpose, and that this was to impart to Garrison unlimited powers to use and manage the interests assigned in such manner as he should deem for the best interests of all the parties." And again, that Garrison did not hold the notes, or any of the other collateral securities, upon a strict pledge, but that he had full power of using or disposing of them as he deemed proper." If such were the powers communicated to Garrison, his use of them would bind the plaintiff at least to the extent that such use

was beneficial·to the plaintiff in extinguishing his former indebtedness. It appeared in evidence that.Garrison kept a usual set of books of account. In them was an account with "C. R. Griggs, contractor," and in it Griggs or the plaintiff was charged with the advance made to him by Garrison, and which were represented by the promissory notes. Of course, while the notes remained as security only for the payment of the advances, they would not be placed in the..account as a credit to plaintiff. They would appear as a credit.only when they should yield cash or be treated as cash in·payment between the parties. On May 1, 1883, the plaintiff was credited in the account with $1,546,982.25. The journal (pages 670, 1616,) in explanation of this credit, states the whole amount of the notes and interest, $2,062,643.13, and then "taken from contractor at 75 per cent., $1,546,982.35," and this last sum was the above credit in the ledger. There could not be a clearer statement of a sale of the notes by the contractor. to Garrison. But the next entry in the journal shows the disposition of the difference in the amounts.' It is in the interest account. The difference, namely, $575,660.78, is credited to that account for the discount on the above notes $2,062,643.13, and that difference is further appropriated to Garrison by crediting it to the profit and loss account and in a subsequent statement of Garrison's assets· the indebtedness of Grigg's was stated at a sum which excluded the amount of indebtedness that on the books was canceled by the credit of $1,546,982.35. On the same 1st May, 1883, the Wheeling & Lake Erie Railroad Company is charged with the whole amount of the notes, and interest, $2,062,643.13, and credited with 75 cents of the par value of the 2,280 bonds. It may be observed here that this operation gave Garrison the benefit of 25 per cent. on the notes and of 25 per cent. on the bonds. It is said that the plaintiff should not have the advantage of the actual transaction proved by the entries in the books, because he knew nothing of the entries, and they were not the result of agreement between the parties. It would appear from the findings that the plaintiff knew and approved of the exchange set forth in the findings; but I think it must be considered that the referee meant that this should be taken with a special finding of fact that the plaintiff knew nothing of the making of the entries, and that therefore he could take nothing·by reason of their admission in evidence. As evidence the entries are admissions by Garrison that the facts described by the entries occurred. These admissions are not explained in the evidence. So far as Garrison was capable of doing· what he in fact effected, there was a taking of the notes at 75 per cent. He· had legal power, or the appearance of it, to do what he effected, while at the same time he held the relation to the plaintiff of a trustee. And this relation permits the plaintiff to affirm the conduct of his trustee and take full advantage of it. In substance, as I think, the transaction involved, among other things, Garrison taking as his debtor for the advances the railroad company in the place of the plaintiff. This extinguished plaintiff's indebtedness at least to the extent of the credit that has already been described. *Smith* v. *Miller*, 43 N. Y. 174, citing *Southwick* v. *Sax*, 9 Wkly. Rep. 22; *Hawks* v. *Hinchcliff*, 17 Barb. 492; *Gage* v. *Punchard*, 6 Daly, 229. This result is corroborated by the facts upon which a claim for a further credit that appears on the books is made by the appellant. The plaintiff's account in the ledger was on August 28, 1883, credited with $575,600. This credit, as first made, was·explained by the journal as follows: "Interest account. Dr. to C. R. Griggs, contractor, for the discount of 25 per cent. on the amount of the notes of the Wheeling & Lake Erie Co., and interest May 1, 1883, amounting to $2,062,643.13, which makes up· the face value of the notes, with interest." And there was added: "Above entry null and void, having been made without proper directions from Mr. C. K. Garrison." Then a red line was drawn through the figures that stated the amount of the credit, both in the ledger and the journal. It is evident from.this that after the·former credit was made Garrison had

weighed its significance, and in his own mind reasserted it. As the referee has found substantially that the second credit was inadvertent, and not authorized by Garrison, there is no sufficient evidence to support it, and the appellant is not entitled to the credit upon the mere fact that it had once appeared in the books, and immediately canceled. While I think that at least the plaintiff was entitled to be credited in the accounting before the referee with the amount of the first credit, and interest to the date of the accounting, I also am convinced that the testimony incontrovertibly showed that the plaintiff was entitled to a larger credit. In my opinion the resolution and the subsequent facts show a purchase by Garrison of 2,280 second-mortgage bonds for his own benefit, and not as a substitution for the notes at 75 cents on the dollar. If this had been carried out he would have been obliged to pay the company from his own money $1,710,000; but it was further provided that the delivery of the bonds should not be on the receipt of the consideration in money, but to pay in part what was called "his" claim against the company. The claim could be "his" only by considering that the plaintiff had ceased to own it. In reality the claim upon which the notes were founded was money of Garrison expended upon the railroad; that is, the notes *pro tanto* were used as money belonging to Garrison. Upon actual delivery for the bonds they became extinguished for Garrison's benefit in the result to the value of the money that Garrison would otherwise have owed the company for the bonds. To the extent the collateral security was extinguished the original indebtedness for which the security had been given was extinguished, and for this reason the plaintiff should have had on the accounting a credit of 75 per cent. on the par value of the bonds, or, if my calculation be correct, $1,710,-000, and interest from May 1, 1883. The transaction is the same as if the plaintiff had received as collateral for a payment of his advances for the company bonds of the company, and had then sold them to Garrison at 75 cents on the dollar, with consent of the company.

I do not think that any other exception of the plaintiff calls for a direction to correct the account in any other particular. The defendants' exceptions, of course, have not been heard on the plaintiff's appeal. In consideration of the exhaustive examination of the case by the referee, and the great ability used by him, I have hesitated in coming to the result that has been announced. The judgment should be reversed, and new trial ordered, and the order of reference vacated, with costs to abide the event, unless the defendants, by stipulation, consent to a deduction from the amount of the judgment recovered by them against the plaintiff of $1,623,667.60, with interest. If such stipulation be given, the judgment is affirmed for the reduced amount, without costs.

FREEDMAN, J., concurs.

INGRAHAM, J., (*dissenting.*) I am unable to agree with my associates in the determination of this appeal. A consideration of the testimony forces upon me the conclusion that but little reliance should be placed upon the evidence of the plaintiff. He first testified during the life-time of the defendant's testator. After his death, when there was no one living who had anything to do with the transaction between the parties, he was recalled as a witness several times. At each time he remembered new conversations with the defendant's testator and his son, who was also dead; such conversations never having been in the presence of any living person, and evidently furnished for the purpose of meeting some emergency of his case as it developed. It would appear as if section 829 of the Code had been systematically disregarded in the admission of the evidence. The fact that Garrison, before his death, had answered certain interrogatories without being sworn in another action, and that such answers were read by defendant upon the trial

of this action, would not make the plaintiff's testimony of anything that subsequently happened competent.   It is only "where the testimony of the deceased person is given in evidence concerning the same transaction or communications" that the evidence-of the other party as to the transaction or communication can be received, and as to many of the communications to which plaintiff was allowed to testify the deceased had given no testimony. This, however, is an appeal by the plaintiff, and, as the defendants' objections to the admission of testimony are not stated in the case, it is impossible to say that any objection was taken to the admission of the evidence.   The nature of the testimony is adverted to, as upon such evidence it would be manifestly improper to reverse the finding of fact of the referee.   By the twenty-second finding of fact the referee finds that the notes therein referred to were issued under an agreement between all the parties "as a temporary expedient for the purpose of stating the accounts; and that thereafter, and as soon as practicable, second-mortgage bonds should be issued to secure or provide for such indebtedness, and to take the place of said notes so temporarily issued;" and by the fortieth finding of fact the consummation of that agreement by the sale and delivery of the bonds to Garrison.   I am satisfied that these findings were sustained by the evidence, but upon the indisputed testimony I think the referee was clearly right in the conclusion to which he arrived.

A very brief review of the facts that are substantially undisputed will be useful in determining. the question.   It is found by the referee, and for the purposes of this appeal must be taken as established, that the plaintiff had assigned to Garrison his contract with the railroad company as security for advances made by Garrison and used by plaintiff to carry out the contract. Garrison had also advanced to plaintiff certain moneys which had been expended for the benefit of the company, and the company was indebted to plaintiff for that money so expended.   The company thus made its promissory notes to plaintiff, who indorsed them and delivered them to Garrison. It is not claimed by either party that these notes were delivered to Garrison in payment of plaintiff's indebtedness to him, but plaintiff claims that Garrison had held them as security for advances made by him to plaintiff.   Garrison, holding these notes, and having other claims against the company, presented ·an account to the company which included the notes in question, and demanded a settlement, and the directors of the company passed a resolution whereby the president was authorized to sell and deliver to Garrison second-mortgage bonds to the amount of $2,280,000 at the rate of 75 cents on the dollar in payment of part of this claim so presented against the company. This was passed with the knowledge of plaintiff.   This being the situation, Garrison, with the plaintiff's knowledge and consent, delivered the notes to the company, and received therefor bonds of the company at the rate of 75 cents on the dollar, secured by a second mortgage on the company's property. It is clear that as between Garrison and the company this was nothing more than a change of the form of the company's indebtedness.   Garrison had obligations of- the company which were presently due and enforceable.   The company were willing to fund such obligations and give in exchange therefor bonds secured by a mortgage upon the property, payable at a future time. There was no present consideration that passed from Garrison to the company, and although the resolution speaks of the transaction as a sale of the bonds, it was really an issue of bonds in part payment of its debt to Garrison. It owed Garrison before the issue of the bonds; it owed him after the issue of the bonds.   The form of the obligation was changed; but whatever change there was in the form of the obligation of the company as between plaintiff and Garrison there was no change in their relation.   Garrison had held certain notes of the company which belonged to plaintiff.   He had, with the assent of plaintiff, delivered those notes to the maker, and received in lieu

thereof their obligations, secured by a mortgage on its property. The only change in the securities was to give to the substituted obligation a lien by way of mortgage upon the debtor's property, and to increase the face value of the obligations 25 per cent. Those bonds were held by Garrison in place of the notes, and were still in the possession of his executors at the time of the trial. The evidence clearly established that before this transaction was completed the notes of the company were worthless, and the bonds issued in lieu thereof worthless. Plaintiff had not in reality advanced one dollar of this amount represented by those notes. Every dollar had been paid by Garrison. Garrison had certainly never received a dollar of the money so advanced, and had never agreed with plaintiff to purchase the second-mortgage bonds. If the bonds had subsequently become valuable securities, could Garrison have refused to account to the plaintiff for their proceeds? Clearly no, for the plaintiff had never parted with whatever interest he had in them, and to say that plaintiff is entitled to a credit for the face value of the worthless notes because his bailee had, with his consent, changed them into higher and better securities of the maker, under circumstances which would have made the bailee respons.ble to the bailor for the substituted securities, would be imposing on the defendant a liability far in excess of that prescribed by any rule of law with which I am acquainted. The full discussion by the referee in his opinion renders a further examination unnecessary. As considerable stress has been laid upon credits in Garrison's books, it may be said that they were not shown to have been made by direction of Garrison. The plaintiff had no knowledge of such entries, and the parties never acted on them. So far as appears plaintiff did not claim, during Garrison's life-time, that the second-mortgage bonds had been purchased by Garrison individually, and there is no evidence that the parties ever acted upon the assumption that any such sale had taken place. At this time, and for a long time prior thereto, plaintiff had been unable to furnish money for the completion of his contract. In fact it does not appear that he ever did furnish any money, but Garrison furnished all that was expended. Plaintiff had been for years in receipt of an annual allowance from Garrison for his services, and it is clear from the correspondence and the acts of the parties that plaintiff considered that he had no real interest in the contract. It could not, under such circumstances, be said that the entry in the books of the parties should be given the same effect as if the agreement between the parties were still understood to be existing and in force. Assuming, however, that the plaintiff should have been allowed the face value of the notes transferred to the company, it does not follow that the judgment must be reversed. It appears that the total amounts of the notes of the company delivered by plaintiff to Garrison was $1,949,710.72. Of this amount $326,043.12 was not delivered to the company in payment of the bonds of the company. Such notes, amounting to $326,043.12, were charged against Garrison by the referee, having been subsequently delivered by him to the company, leaving $1,623,667.60 as the notes given by Garrison in payment of the second-mortgage bonds. This amount, under the rule as stated in the opinion of the chief judge, should have been charged against Garrison. This amount, with interest, can now be deducted from the amount of the judgment awarded against the plaintiff, and, as thus modified, the judgment affirmed, without costs of this appeal; this modification to be made upon defendants' consent thereto.